**James DE LAY and Marjorie DeLay, Respondents,**

v.

**Jase M. WARD, Appellant.**

No. 7327.

Springfield Court of Appeals.

Missouri.

Feb. 5, 1955.

Ward & Reeves, Caruthersville, for appellant.

Limbaugh & Limbaugh, Cape Girardeau, for respondents.

McDOWELL, Presiding Judge.

This appeal is from a judgment for $1,-000 damages rendered in the Circuit Court of Stoddard County, Missouri, in favor of plaintiffs for alleged injuries sustained by plaintiffs' minor child caused by being struck by an automobile operated by defendant.

Plaintiffs' action was for medical and nursing expenses and loss of services sustained to their minor child because of negligence of defendant. Both primary and humanitarian negligence is pleaded but the former theory was abandoned and the cause submitted to the jury solely upon humanitarian negligence in failing to slacken speed, swerve or warn.

Dianne Sue DeLay was injured when crossing Main Street on Highway No. 91 in Bell City, Missouri. Main Street extends from the southwest to the northeast. It is a "black top", hard surfaced highway, 18 feet in width. This highway coming from the southwest crosses the Cotton Belt Railroad tracks and makes a bend to the northeast as it enters the main part of town. This bend is about 150 yards southwest of the DeLay Brothers' Garage, which is located on the northwest side of Main Street about 30 feet from the edge of the street.

The accident occurred about 3:20 P. M., November 30, 1951. Defendant was traveling northeastwardly on the right hand side of the highway and Dianne Sue was crossing the highway from the edge of a sewer about 6 feet from the northwest side of the highway in an angling direction to the northeast, towards town. She was struck and injured when in about 2 or 3 feet from the northeast edge of the highway. There was an intersecting road or street running north and south and the child was struck about the center of this intersecting road on the northeast side of Main Street.

Plaintiffs' evidence, to sustain the issue of humanitarian neglience, depends solely upon two witnesses.

Fred McKee testified that he was an employee of the DeLay Garage and was working on a self-propelled combine at the time of the accident, testing the rear wheels. He stated that Highway 91 or Main Street runs from the south to the northeast through the town; that the garage is about 30 feet northwest of the highway; that the combine was in motion and had been run out on the highway about a foot and no further; that the highway at the place is 18 feet wide. He gave this testimony:

"Q. Did you happen to see, this time you were repairing the combine, Dianne DeLay? A. Yes, sir; she was sitting there putting rocks down that sewer.

"Q. Now where is the sewer in relation to the combine? A. It was about 10 foot northeast of the combine.

"Q. Well, now was it on the road, or what was its location with respect to the side of the road? A. Oh, it was 5 or 6 feet from the road.

"Q. Sticking back towards the garage? A. Yes.

"Q. When did you first see his car? A. Oh, just before he got to the combine. It was around 20 foot, maybe more, from where he struck the girl.

"Q. Now, Mr. McKee, at about that time were you in a position where you could see his car? A. Yes, sir.

"Q. Where were you at this time? A. I was behind the combine.

"Q. And you could see in front of of you to the left and right then? A. I could see on both sides, yes, sir.

"Q. What do you judge his speed was? A. I would say he was going 25 or 30 mile an hour.

"Q. Now, Mr. McKee, in your best judgment how far back was Mr. Ward's automobile from the time that he first was able to see the little girl, either as she was playing there at the sewer or as she was starting to go across the street, if she was doing that. About how far was he from that child, in your best judgment? A. What; the time I saw him?

"Q. Yes. A. He was 20 foot or more.

"Q. Then what did the little girl do? A. She just jumped up and run angling across the road.

"Q. Did you see Mr. Ward in his automobile at that time? As she was starting to run across the road? A. Yes; I saw him.

"Q. Did you see his face? A. No, sir; I seen that he was going to hit the girl, I didn't even look at him at that time.

"Q. What did you look at? A. I was watching the girl, when the car hid her view from me.

"Q. Can you explain to the jury here just what happened about that time? A. Well, she ran in the front of him, and the front of the car hid her view from me and she was just about 2, 2 or 3 foot from the other edge of the road, the opposite side of her, where she started from. * * * Well, he ran over her; picked her up and carried her for 40 feet, and she fell off and the rear wheel run over

her, and he went another 40 foot before he stopped. * * * I measured them."

The witness testified the point where the child was struck was about the center of the intersection of a street that runs into Main Street; that the little girl was running just about as fast as she could run. He stated the combine was about 10 foot wide; that he didn't see the Ward car swerve and it did not slow down until after the child fell off under the car; that he did not honk his horn.

On cross-examination the witness stated that he had testified in a case where the minor child was plaintiff; that he remembered testifying the combine was backing up at the time of the accident. He stated he had testified that the combine had just pulled out and was backing up to see if the steering wheel would steer. He gave this testimony on the former trial:

"Q. 'How far out in the road, then? A. It pulled out about 6 feet.'

"Q. Now do you remember making that answer? A. Yes, sir, it pulled out there, but I mean when the car went and come back it pulled—

"Q. I see. Then it had half of that highway blocked, then. A. No not, it didn't have half of it.

"Q. Well, anyway, it pulled out 6 feet. A. Yes.

"Q. Then you were in error about it just pulling out one foot? A. No; I hit—it was out about a foot when Mr. Ward went around.

"Q. Well, I thought I just asked you if it had pulled out farther than that at any time. A. Yes, sir; it pulled out 5 foot.

"Q. I see; all right. Now I believe you testified here this morning that Mr. Ward when you first saw him was approximately 20 feet from the place where the child was struck—A. Yes, sir.

"Q. Now at that time, at that instant where was the child. When you first saw Mr. Ward. A. Just jumped up and run just about the time I saw Mr. Ward.

"Q. All right. Now when she jumped up and started to run it was impossible for Mr. Ward to see the child, wasn't it? Wasn't the combine in the way? A. Yes, I imagine it was.

"Q. In other words, this sewer where the child was playing was behind the combine, and the combine was between this sewer and Mr. Ward as he approached northeast on the highway; is that correct? A. That's right.

"Q. Then when the child first jumped up to run across the street Mr. Ward could not see the child: is that correct? When the child first jumped up from the sewer—A. No, not when it first jumped up.

"Q. And as a matter of fact Mr. Ward could not see that child until the child had cleared the end of the combine, which was extending about one foot over on the pavement at that time according to your testimony: is that right? A. That's right.

"Q. So when Mr. Ward first saw the child or was in a position where he could see the child, why, he was substantially less than 20 feet from the child: is that correct? A. Yes, sir; it just run right in front of the car."

On redirect examination this question was asked:

"Q. Your best judgment, Mr. McKee: how far away was the little girl from the automobile when she first came into his view, that is when he was first able to see her as she was playing around the combine, or in whatever position she was? A. The little girl was poking rocks down in this sewer, and I looked up and I saw Mr. Ward's car

just—before it got to the combine the little girl jumped up and run across the road, and the view of the car hid the little girl from me just as she was getting to the far side of the road.

"Q. Yes. Now, how far away was the little girl from Mr. Ward's car when he was first able to see her? A. Well, I don't even know whether he saw her or not.

"Q. Let me rephrase this question. Assuming that Mr. Ward was looking straight ahead in his automobile, and having a lateral view also, how far away was the little girl from his automobile when he was first able to see her. Your best judgment on it, Mr. McKee. (A pause) We are just trying to clarify this distance in the minds of the jury here. A. Well, I wouldn't know.

"Q. Could you give us your best judgment, Mr. McKee? A. Well, I would say 10 foot."

The witness stated that the child jumped up and started to run across the road and that he didn't have time to holler; that it happened too quickly.

Hubert DeLay testified as follows:

"Q. Now where were you working on the combine at this time? A. I was on the right hand rear corner of it; I was behind it.

"Q. Did you have occasion to notice Mr. Ward's automobile at this time? A. Just as he come around the corner.

"Q. Now how far is that corner from the garage. Your best judgment. A. Oh, I would say approximately 150 yards.

"Q. Could you give us your best judgment as to what the speed of the automobile was at that time? A. Well, I would say approximately 25 miles an hour.

"Q. Did you have occasion to see the car at any other time? A. No; I didn't."

This witness testified that he thought he was down behind the combine, right behind it and did not see the car as it got to the combine; that the first time he saw the car after it had rounded the curve 150 yards away was just as the little girl was rolling out from under the rear of it; that he heard the lick and that caused him to look up; that he did not actually see the car strike the child. He testified that the car continued 40 feet from where the child lay after the accident; that the road is 18 feet wide; that he didn't see this child playing around the sewer or at all that day. He stated the sewer is approximately 5 or 6 feet from the edge of the highway and was approximately 10 feet from where the combine was at the time. He testified definitely that the combine had never been more than one foot out on the highway.

Marjorie DeLay testified that November 30, 1951, was right before Dianne Sue's fourth birthday.

This was all of the testimony offered by plaintiffs to sustain their case.

Defendant testified that on the day of the accident, November 30, 1951, he was on his way back from Cape Girardeau to Bell City, driving his 1949 Mercury; that it was 150 yards from the curve where the road turns northeast through Bell City to the DeLay Garage; that he rounded the curve driving about 20 or 25 miles per hour and observed a self-propelled combine in the road at the garage which completely blocked the road; that as he approached this combine he checked his speed and shifted gears but didn't stop. He gave this answer: "A. * * * I was near the combine when it pulled out and gave me the room, I proceeded to go by the combine; and just as I got the far end of this combine the little girl darted out from behind the combine right in front of my car, and it was absolutely impossible for me to keep from hitting the little girl." The witness stated that as he approached the combine it headed back into the garage; that it did not go straight back but a little to the northeast. He gave this testimony:

"Q. All right, sir; now approximately how slow did you slow down to as you approached this combine? A. * * * I will say that I got down to 10 miles an hour approaching this combine. * * * I shifted gears.

"Q. All right, sir; now after that, when the combine gave you your right half side of the highway, did you increase your speed then? A. Well, I might have increased my speed a little; I don't know what gear I was in when I hit the little girl, I don't know whether my car hit her, I don't know whether I shifted back to high or not, but I will say this and I know this, I am not exaggerating. I will put my speed at anywhere from 15 to 20 miles when my car bumper struck the little girl."

The witness testified that as he was traveling north he was keeping a lookout down the road. He gave this testimony:

"Q. Now, Mr. Ward, how far away were you from the little girl Dianne Sue DeLay at the time she dashed from behind the combine into your view? * * * A.—this was awfully quick. And I will say anywhere from 5, 6 to 8 foot, something like that to the very best of my knowledge."

This case arises out of the same accident as the case of DeLay v. Ward, Mo.Sup., 262 S.W.2d 628, which reversed a decision by the Springfield Court of Appeals, reported in 262 S.W.2d 626.

We are first met with the contention in the instant case that the opinion of the Supreme Court in DeLay v. Ward, supra, which was a judgment in favor of Dianne Sue DeLay against Ward for personal injuries growing out of the same accident, is the law in the instant case because the facts of the instant case are not substantially different from the former case.

In defendant's brief, on page 7, this statement is made:

"Realizing that the court is bound by the ruling of the Supreme Court unless the evidence is substantially different,

* * * we will undertake to demonstrate that the facts found and inferred by the Supreme Court are not the facts in this case."

In Lonnecker v. Borris, Mo.Sup., 245 S.W.2d 53, 55, the law is stated:

" * * * The adjudication of that appeal and the questions presented constitute the law of this case and of this appeal unless the former ruling was palpably wrong or unless there is a substantial difference in the evidence and the facts upon the two trials. * * *"

There is no contention in the instant case that the former ruling was palpably wrong and we follow that opinion as correct. Bray v. St. Louis-San Francisco Ry. Co., Mo.App., 259 S.W.2d 132, 138.

We, therefore, must determine if the evidence in the instant case is substantially different from the evidence passed upon by the Supreme Court in the former case.

Defendant, in his argument, states there are three basic evidentiary facts to be proved in a humanitarian case: 1. Speed of defendant; 2. Speed of plaintiff; 3. Distance between them when position of peril arose.

Under this analysis defendant first takes up the question of the speed of the defendant and contends that the evidence shows the speed to be 15 miles per hour. That contention is based upon defendant's testimony in which he testified that as he approached the combine he slowed down to 10 miles per hour and changed gears; that when the combine moved off the road giving him the right-of-way, he increased his speed possibly to between 15 and 20 miles per hour.

The Supreme Court, in the former case, set out the testimony of defendant, 262 S.W.2d on page 631 of the opinion as follows:

" ' * * * All right, as I got up closer and closer, I kept slowing down, driving along slow, you know, and I expect I got down to 10 mile, waiting for the combine to give me room to go

on up through Bell City. * * * when that combine give me my half of that right-of-way there on 91 Highway, I was right up pretty close to the combine. * * * I don't think I was driving over 15 mile but I would say 20 to be sure, to catch the speed I was driving. * * *'"

We submit that is practically the same testimony as offered in the instant case. From this testimony the Supreme Court, on page 634 of its opinion, states:

"Considering the evidence in a light most favorable to plaintiff, as we must, the jury could believe and find from defendant's own testimony that at the time he started to pass the combine his speed was approximately 10 miles per hour. * * *"

We hold that upon this particular fact the evidence was substantially the same in the two cases.

Defendant's second contention is that the evidence is substantially different as to the speed of the little three year old girl in the former trial in which the court found the jury could infer was from 4 to 6 miles per hour. In the instant case, the mother testified that the date of accident was just before her fourth birthday. She actually was still three years of age. We are unable to agree with the contention of defendant that this testimony was substantially different from the testimony in former trial.

We agree with plaintiffs that the only testimony offered in either case as to the speed of the little girl was that she ran about as fast as she could and that the Supreme Court took judicial knowledge that that rate of speed was from 4 to 6 miles per hour. We hold that the jury might draw that inference under the facts in the instant case.

The last contention is as to the distance between defendant's car and Dianne Sue at the time defendant could have discovered her peril.

In the former case, witness McKee testified for plaintiff that when he first observed defendant's car it was near the combine and traveling at a speed of 25 to 30 miles an hour, and, in the instant case, he said a speed of 25 miles an hour. We believe the jury would have to disregard this testimony in both cases, and, under the holding of the Supreme Court, did so disregard it. The testimony in both cases was that the road was 18 feet wide at place of injury; that the combine was one foot on the road; that the little girl could have been observed at the time she was about one foot on the road or as she passed the combine and that, from these physical facts, taking into consideration the distance traveled by the little girl, which was the same in both cases, the jury could have inferred, as the Supreme Court said, that defendant's automobile was 20 feet or even more than 20 feet from the child at the time she could have been observed and that traveling 10 miles per hour the car could have been stopped or the speed checked so as to have avoided the injury. We think the evidence in the former case was substantially the same as in the instant case.

Plaintiffs are entitled to the benefit of the evidence most favorable to them. They are not bound by testimony of the defendant which is in opposition to their theory. It is true that in the present case, McKee, on cross-examination, stated that, in his opinion, defendant's car was considerably closer to the little girl than 20 feet at the time he could have observed her in peril and, on redirect examination, stated he was within 10 feet of the child, yet, we believe that from the physical facts and defendant's testimony, he slowed down to 10 miles an hour, the same inferences could be drawn in the instant case as were drawn in the case decided by the Supreme Court en banc.

On page 635 of the former opinion, the Supreme Court stated: " * * * but the jury could have found from other evidence that defendant was more than 20 feet away, * * *."

The same is true under the evidence in the instant case. The jury could have found from the physical facts, as in the former case, that defendant was considerably more than 20 feet from place of accident when he

could have observed the child in peril. We find for plaintiffs on this contention.

It is unnecessary to decide the other assignments of error.

Judgment affirmed.

STONE and RUARK, JJ., concur.